ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2025-Jun-11  15:41:31
60CV-25-6083
C06D12 : 18 Pages

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
## LAW DIVISION

| | | |
|---|---|---|
| COMMONSPIRIT HEALTH d/b/a CHI ST. VINCENT | ) ) ) | |
| Plaintiff, | ) ) ) | Case No. XXXXX |
| v. | ) ) ) | |
| LOUISIANA HEALTH SERVICES, INC. D/B/A BLUE CROSS AND BLUE SHIELD OF LOUISIANA; and DOES 1 THROUGH 25, INCLUSIVE, | ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

### PLAINTIFF COMMONSPIRIT HEALTH d/b/a CHI ST. VINCENT'S COMPLAINT AT LAW

1. Plaintiff, COMMONSPIRIT HEALTH d/b/a CHI ST. VINCENT (hereinafter "ST. VINCENT"), by and through its attorneys, LAW OFFICES OF STEPHENSON, ACQUISTO & COLMAN, for its Complaint at Law ("Complaint") against LOUISIANA HEALTH SERVICES, INC. D/B/A BLUE CROSS AND BLUE SHIELD OF LOUISIANA, (hereinafter "BCBSLA"), and DOES 1 THROUGH 25, INCLUSIVE, upon personal information as to their own activities and upon information and belief as to the activities of others and all other matters, and states as follows:

### INTRODUCTION

2. This is an action against BCBSLA for breach of implied-in-fact contract and *quantum meruit* arising from a business relationship between ST. VINCENT and BCBSLA. By this action, ST. VINCENT seeks compensatory damages, interest, and costs.



## PARTIES

3.      Plaintiff ST. VINCENT is a not-for-profit public benefit corporation organized and existing pursuant to the laws of the State of Arkansas. ST. VINCENT, through its regional health network, COMMONSPIRIT HEALTH and its subsidiaries, including but not limited to ST. VINCENT INFIRMARY MEDICAL CENTER, has its principal place of operation in the City of Little Rock, County of Pulaski, Arkansas. ST. VINCENT provided medical care to Patients (as such term is defined herein), who were BCBSLA beneficiaries when such medical care was provided.

4.      BCBSLA is a domestic insurance company, incorporated in the state of Michigan with its principal office and registered agent located at 600 East Lafayette Boulevard, Suite 1929 Detroit Michigan.

5.      ST. VINCENT is unaware of the true names and capacities, whether corporate, associate, individual, partnership or otherwise of defendants DOES 1 through 25, inclusive, and therefore sues such defendants by such fictitious names. ST. VINCENT will seek leave of the Court to amend this Complaint to allege its true names and capacities when ascertained.

6.      BCBSLA and Does 1 through 25, inclusive, shall be collectively referred to as "BCBSLA" or "Defendants."

7.      Defendants, each of them, at all relevant times, have transacted business in the State of Arkansas. The violations alleged within this Complaint have been and are being carried out in the State of Arkansas.

8.      ST. VINCENT is informed, believes and thereon alleges that at all relevant times each of the Defendants, including the defendants named "Doe," was and is the agent, employee, employer, joint venturer, representative, alter ego, subsidiary and/or partner of one or more of the

other defendants, and was, in performing the acts complained of herein, acting within the scope of such agency, employment, joint venture, or partnership authority, and/or is in some other way responsible for the acts of one or more of the other defendants.

## JURISDICTION AND VENUE

9.      Jurisdiction over this matter exists under Ark. Code Ann. § 16-4-101(B) because ST. VINCENT, through its regional health network, CHI St. Vincent, is a resident of the State of Arkansas and because BCBSLA transacts business in Arkansas, and because BCBSLA's making and performance of the transactions, and the implied-in-fact contracts at issue are substantially connected with the State of Arkansas.

10.     Venue is proper in the Circuit Court of Pulaski County pursuant to Ark. Code Ann. § 16-60-101 because it is the county in which the transactions occur out of which the cause of action arises.

## FACTUAL BACKGROUND

11.     ST. VINCENT, between the dates of September 28, 2020 and May 1, 2023 provided medically necessary treatment to the individuals identified on the spreadsheet attached as Exhibit A[1] to this Complaint (and which is incorporated herein by this reference as though set forth in full) (the "Patients") totaling five claims. On the dates of service set forth in Ex. A ("the Dates of Service"), ST. VINCENT rendered medically necessary services, supplies and/or equipment to Patients until Patients became stable for discharge from ST. VINCENT.

---

[1] ST. VINCENT has limited disclosure of patient identification here pursuant to the privacy provisions of the Health Insurance Portability & Accountability Act ("HIPAA"), 42 U.S.C. §§ 1320 *et seq*. A more detailed Exhibit can be provided upon entry of a Court ordered, HIPAA compliant protective order.

12.    ST. VINCENT is informed and believes and thereon alleges that at all relevant times Patients were enrollees and/or beneficiaries of health plans sponsored, financed, administered, and/or funded by BCBSLA.

13.    ST. VINCENT is informed, believes and thereon alleges BCBSLA is financially responsible for the medically necessary services, supplies, and/or equipment (including, but not limited to, emergency care) rendered to the Patients on the Dates of Service.

14.    Prior to and during the dates of service set forth in Ex. A, ST. VINCENT sought authorization for treatment from BCBSLA. BCBSLA gave authorization reference numbers, represented that authorization was pending, and/or requested supporting clinical medical records which ST. VINCENT provided.

15.    Insurance companies like BCBSLA receive millions of dollars in premiums collected from their clients and insureds in exchange for the promise of making benefit payments to healthcare providers for emergency and other medical services rendered to their members.

16.    BCBSLA received premium payments for Patients' enrollment and coverage in BCBSLA's respective health plans.

17.    BCBSLA accepted the services ST. VINCENT provided to Patients as demonstrated by acts including but not exclusive to issuing authorizations and collection of premiums.

18.    ST. VINCENT's usual and customary charges for the medically necessary services, supplies and/or equipment rendered to Patients amounted to $1,309,738.57.

19.    ST. VINCENT timely and properly submitted the bills containing said charges for the medically necessary services, supplies, and/or equipment rendered to Patients to BCBSLA for payment.

20.    Rather than properly and fully pay ST. VINCENT for the medically necessary services, supplies, and/or equipment ST. VINCENT rendered to the Patients, BCBSLA underpaid, issuing payments of $444,778.18. To date, BCBSLA owes ST. VINCENT no less than $103,546.30. Ex. A.

21.    BCBSLA failed to pay fully and properly ST. VINCENT for the medically necessary services, supplies, and/or equipment rendered to Patients, despite demands thereof.

22.    BCBSLA has refused, despite ST. VINCENT's repeated demands, to fully and properly pay ST. VINCENT the reasonable and customary value of the medical care rendered to BCBSLA's beneficiaries as specified in Ex. A. BCBSLA has unjustly benefitted by not paying fully ST. VINCENT for the reasonable value of such services.

23.    BCBSLA unjustly benefitted by not paying fully ST. VINCENT for the reasonable value of such services. BCBSLA promised its beneficiaries (including Patients) that it would pay medical providers who provided emergency and necessary medical treatment to those beneficiaries in exchange for Patients' premiums, collected such premiums and then refused despite demands to fully and properly pay ST. VINCENT the reasonable and customary value of the medical care rendered to BCBSLA's beneficiaries as specified in Ex. A. BCBSLA accepted the services ST. VINCENT provided to Patients as demonstrated by acts including but not exclusive to issuing authorizations and collection of premiums.

24.    BCBSLA further unjustly and directly benefitted when it caused ST. VINCENT to treat its beneficiaries, Patients, thus improving BCBSLA's patient-population risk pool as Patient was now healthier and less of a cost exposure risk to BCBSLA's insurance funds and allowing BCBSLA's profits to continue with further guarantee that a healthier and still living Patient would

ensure that the BCBSLA would be allowed to collect future premiums for Patients' enrollment in BCBSLA's health plan.

25.    BCBSLA further unjustly and directly benefited when it caused ST. VINCENT to treat its beneficiaries, Patients, in the following ways:

a)  Improved Health Outcomes – BCBSLA has a vested interest in keeping their enrollees, like Patients, healthy, as healthier individuals require less medical care and incur fewer costs. By encouraging their enrollees, like Patients, to seek medical care when needed, including hospitalization, when necessary, BCBSLA helped prevent Patients' illness from becoming more serious and costly for BCBSLA.

b)  Better Customer satisfaction – when Patients received quality care at ST. VINCENT, Patients were more satisfied with their health insurance coverage which led to increased loyalty and retention rates for BCBSLA.

c)  Increased Market Share – by offering competitive coverage that includes access to high-quality hospitals, like ST. VINCENT, BCBSLA was able to attract new customers and retain existing ones. This helped them gain a larger share of the market which led to increased profits and better bargaining power with healthcare providers.

d)  Cost Savings – with an improved health outcome of Patients, BCBSLA saved money by avoiding further future costly treatments and is therefore able to keep premiums lower for their customers, further increasing BCBSLA's attractiveness and competitiveness in expanding its patient-pool.

26.    As a direct and proximate result of BCBSLA's wrongful conduct, ST. VINCENT has suffered damages in an amount to be proven at trial but not less than the sum of $103,546.30 exclusive of interest.

## COUNT I – BREACH OF IMPLIED-IN-FACT CONTRACT
(Against Defendant BCBSLA and DOES 1 through 25, inclusive)

27.    ST. VINCENT incorporates by reference and re-alleges paragraphs 1-26 of this Complaint here as though set forth in full.

28.    ST. VINCENT and USAble Corporation (d/b/a Arkansas Blue Cross Blue Shield) ("ABCBS") – a non-party to this action have a written contract and that contract informs and guides ST VINCENT'S relationships with other entities including out-of-state Blueu Cross insurers, e.g. Defendant (the "Contract"). Among other things, the Contract obligated ST. VINCENT to medically treat individuals who were certain beneficiaries of non-ABCBS health plans. Specifically, the Contract obligated ST. VINCENT to medically treat individuals belonging to health plans financed, sponsored, and/or administered by member companies belonging to the national Blue Cross Blue Shield Association, of which BCBSLA is one such member.

29.    Although BCBSLA was not a signatory to or obligee of the Contract, the Contract nonetheless bound ST. VINCENT to treat BCBSLA's beneficiaries. The Contract also obligated ST. VINCENT to accept as payment in full monies received from Blue Cross Blue Shield Association member companies (such as BCBSLA) that were made at the discounted rates found within the Contract.

30.    At all relevant times, the Contract between ST. VINCENT and ABCBS bound ST. VINCENT to treat beneficiaries not only of health plans financed, sponsored, and/or administered by ABCBS, but also for beneficiaries of health plans financed, sponsored, and/or administered by member companies of the national Blue Cross Blue Shield Association. One such member company of said association is BCBSLA. Thus, even though BCBSLA never signed the Contract nor is obligated under the Contract, ST. VINCENT must nevertheless medically treat BCBSLA

members and accept payment, in full, from such member companies, with the payment received conforming to the rates found within the Contract.

31.    All BCBSLA needed do to take advantage of such medical treatment and discounted rates on behalf of its members/beneficiaries was to issue a "Blue Card" program identification card. The members/beneficiaries could then present their "Blue Card" program identification card to ST. VINCENT at admission, which signaled to ST. VINCENT that it must medically treat such patient pursuant to the terms of the Contract and must accept payments at the discounted rates found in the Contract even though BCBSLA was not a signatory to the Contract. Otherwise, ST. VINCENT would be in violation of its contractual duties.

32.    In this way — by conduct alone and with no express agreement between them — an implied-in-fact contract arose between ST. VINCENT and BCBSLA each time one of the Patients presented to ST. VINCENT their BCBS-issued "Blue Card" program identification card and/or otherwise identified themself as being a member/beneficiary of a health plan financed, sponsored, and/or administered by a member company of the national Blue Cross Blue Shield Association.

33.    Each of the Patients specified in Exhibit A presented a "Blue Card" program identification card issued by BCBSLA and/or otherwise identified themself as belonging to a health plan financed, sponsored, and/or administered by BCBSLA at the time of their hospital stay at ST. VINCENT on the Dates of Service.

34.    Accordingly, each time one of the Patients sought medical treatment at ST. VINCENT and so identified themself, an implied-in-fact contract arose in which ST. VINCENT agreed to render to that Patient all medically necessary services, supplies, and/or equipment needed by that individual and secondarily agreed to accept as payment, in full, monies received from

BCBSLA that were in conformance to the discounted rates found in the Contract. In return, BCBSLA agreed to pay for such care, albeit at the appropriate discounted rate regarding such care.

35.    ST. VINCENT's usual and customary charges for rendering the medically necessary services, supplies, and/or equipment to the Patients set forth in Exhibit A, amounted to $1,309,738.57. At the rates found within the Contract, BCBSLA should have paid an aggregate amount of $545,572.07. However, BCBSLA only paid $444,778.18, leaving a deficit of $103,546.30 which amounted to a breach of its implied-in-fact contracts with ST. VINCENT.

36.    No express written contract between BCBSLA and ST. VINCENT existed to prescribe payment for the medically necessary services, supplies, and/or equipment rendered to Patients and ST. VINCENT did not perform those services gratuitously. Rather, BCBSLA knew and understood that ST. VINCENT rendered such treatment with the expectation of being paid the discounted rates under the Contract and through the Blue Card program.

37.    Prior to the treatment rendered by ST. VINCENT, through industry custom and practice, BCBSLA impliedly agreed, promissorily impliedly expressed and understood that ST. VINCENT would render medically necessary care to BCBSLA beneficiaries, submit bills for such care to BCBSLA, and that BCBSLA would pay the discounted rates under the Contract to ST. VINCENT for the necessary medical treatment rendered to Patients, rather than Patients themselves (except for co-payments, deductibles, and co-insurance amounts, in any).

38.    Specifically, prior to the dates that ST. VINCENT admitted Patients to its facilities for medical services, ST. VINCENT contacted BCBSLA to verify Patients' healthcare eligibility under a BCBSLA health plan, to obtain authorization from BCBSLA for the medical services rendered and to be rendered, and to establish its right to be paid by BCBSLA the discounted rates under the Contract for such care. In response, BCBSLA represented that Patients were

beneficiaries of one of BCBSLA's health plans, provided the authorization numbers incorporated in Ex A, and approved admissions of the Patients.

39.     At no time did BCBSLA represent that it would not pay the discounted rates under the Contract to ST. VINCENT for the necessary medical treatment rendered to Patients.

40.     Through ST. VINCENT's treating the Patients, ST. VINCENT's initiating contact with BCBSLA as described above, and BCBSLA's instructing the Patients to present their BCBSLA-issued "Blue Card" membership identification to ST. VINCENT, Plaintiff and Defendant entered into an implied-in-fact contract. The Contract was also formed through industry custom and practice, as well as Plaintiff and Defendant's prior and on-going course of conduct *vis-à-vis* the "Blue Card" program. Prior course of conduct included, among other things:

a)  BCBSLA's issuance of identification cards to Patients;

b)  BCBSLA's instructing Patients to present such identification cards to medical providers so as to give assurances to those medical providers that such care would be paid for;

c)  ST. VINCENT communicating with BCBSLA to ask for authorizations to render medical care to Patients and BCBSLA issuing authorizations to ST. VINCENT for such care;

d)  BCBSLA communicating to ST. VINCENT the medical eligibility benefits for Patients without advising ST. VINCENT that BCBSLA would not make full payment of the discounted rates under the Contract for the services to be provided to Patients;

e)  BCBSLA sending written approvals to ST. VINCENT for the specified medical services for Patients;

f)  BCBSLA requesting that ST. VINCENT send BCBSLA clinical information and medical records.

41.    In addition, prior course of conduct by BCBSLA included ST. VINCENT submitting claims to BCBSLA and in response, BCBSLA would properly pay the discounted rates under the Contract for those claims. Over the last five (5) years, ST. VINCENT has billed numerous claims and BCBSLA has satisfactorily paid on a number of claims submitted by ST. VINCENT in the near identical manner and method as the facts alleged herein.

42.    BCBSLA directly and deliberately benefited from those services by prompting, through its words and prior and ongoing conduct, and through the custom and practice in the healthcare industry, that ST. VINCENT perform those services on Patients who were beneficiaries of BCBSLA, thus fulfilling BCBSLA's obligation to secure medically necessary healthcare for its beneficiaries. When Patients received those services, the express insurance coverage agreement made between BCBSLA and Patients was satisfied and BCBSLA was able to retain rightfully the premiums paid on behalf of Patients for enabling Patients to receive the medical care performed by ST. VINCENT. Further, ST. VINCENT directly conferred a benefit upon BCBSLA when it helped BCBSLA make good on promises BCBSLA made to its own members/beneficiaries that it would arrange for them to receive timely medical care, when necessary, at a first-rate medical facility.

43.    ST. VINCENT provided medically necessary care to BCBSLA beneficiaries as described above.

44.    ST. VINCENT properly billed BCBSLA for the medically necessary services provided to Patients as listed in Ex. A.

45.    BCBSLA breached the implied-in-fact contract by paying only $444,778.18, resulting in an aggregate underpayment of $103,546.30, per the discounted rates under the Contract, for the medical services performed by ST. VINCENT.

46.     ST. VINCENT performed all conditions required on its part to be performed in accordance with the terms and conditions of the implied-in-fact contract.

47.     BCBSLA breached the implied-in-fact contract by underpaying ST. VINCENT for the medically necessary services, supplies and/or equipment rendered or supplied to Patients.

48.     As a direct and proximate result of BCBSLA's breach of the implied-in-fact contract, ST. VINCENT suffered damages in an amount to be proven at trial but not less than the sum of $103,546.30, exclusive of interest.

49.     WHEREFORE, ST. VINCENT prays this Court enter judgment in its favor and against BCBSLA as follows:

   a)   For the principal sum of $103,546.30;

   b)   For interest on such principal sum pursuant *to* Ark. Code Ann. § 4-57-101(d) (eff. Aug. 2013); *Mo. & N. Ark. R.R. v. Entergy Ark., Inc.,* 2013 U.S. Dist. LEXIS 139204 (E.D. Ark. Sept. 27, 2013*)* and;

   c)   For such other and further relief as the Court deems just and proper.

### COUNT II – QUANTUM MERUIT (IN THE ALTERNATIVE)
(Against Defendant BCBSLA and DOES 1 through 25, inclusive)

50.     ST. VINCENT incorporates by reference and re-alleges paragraphs 1-26 of this Complaint here as though set forth in full.

51.     On the dates of service set forth in Ex. A, ST. VINCENT provided emergency and/or medically necessary care to Patients.

52.     In the alternative, assuming *arguendo* that it is determined that no express or implied-in-fact contract between BCBSLA and ST. VINCENT existed, and/or that such a contract cannot be enforced as to the payment for the medically necessary services, supplies and/or

equipment rendered to Patients, Plaintiff should nevertheless be fully paid under the common law doctrine of *quantum meruit*.

53.    ST. VINCENT did not perform these services gratuitously. Rather, BCBSLA, by its words and prior and ongoing conduct, and through the custom and practice in the healthcare industry, knew and understood that ST. VINCENT rendered such treatment with the expectation of being paid.

54.    Prior to the treatment rendered by ST. VINCENT to Patients, through industry custom and practice, BCBSLA impliedly agreed and understood that ST. VINCENT would render medically necessary services to BCBSLA beneficiaries, submit bills for such care to BCBSLA, and that BCBSLA would pay the usual and customary value to ST. VINCENT for the necessary medical treatment rendered to Patients, rather than Patients themselves (except for co-payments, deductibles, and co-insurance amounts, in any).

55.    Specifically, prior to the dates that ST. VINCENT admitted Patients to its facilities for medical services, ST. VINCENT contacted BCBSLA to verify Patients' healthcare eligibility under a BCBSLA health plan, to obtain authorization from BCBSLA for the medical services rendered and to be rendered, and to establish its right to be paid by BCBSLA the usual and customary value for such care. In response, BCBSLA represented that Patients were beneficiaries of one of BCBSLA's health plans, provided authorization numbers incorporated herein, and approved admission of Patients.

56.    At no time did BCBSLA represent that it would not pay the usual and customary value to ST. VINCENT for the necessary medical treatment rendered to Patients and at no time did ST. VINCENT represent that it would perform the services gratuitously.

57.    By treating Patients and initiating contact with BCBSLA as described above, ST. VINCENT provided a benefit to BCBSLA and BCBSLA failed to compensate properly ST. VINCENT for that received benefit, despite the prior and on-going course of conduct between ST. VINCENT and BCBSLA. Prior course of conduct included, among other things:

a)  BCBSLA's issuance of identification cards to Patients;

b)  BCBSLA's instructing Patients to present such identification cards to medical providers so as to give assurances to those medical providers that such care would be paid for;

c)  ST. VINCENT communicating with BCBSLA to ask for authorization to render medical care to Patients and BCBSLA issuing authorization to ST. VINCENT for treatment for that care;

d)  BCBSLA communicating to ST. VINCENT the medical eligibility benefits for Patients without advising ST. VINCENT that BCBSLA would not make full payment of the usual and customary value of the services to be provided to Patients;

e)  BCBSLA sending written approval to ST. VINCENT for the specified medical services for Patients;

f)  BCBSLA requesting that ST. VINCENT send BCBSLA clinical information and medical records.

58.    In addition, prior course of conduct by BCBSLA included ST. VINCENT submitting claims to BCBSLA and in response, BCBSLA would properly pay the usual and customary value of those claims. Over the last five (5) years, ST. VINCENT have billed numerous claims and BCBSLA has satisfactorily paid on a number of claims submitted by ST. VINCENT in the near identical manner and method as the facts alleged herein.

59.    In addition, BCBSLA pre-verified Patients' coverage and eligibility and authorized the treatments.

60.    BCBSLA's authorizations for the treatments were implied requests to ST. VINCENT to perform those services on behalf of Patients.

61.    ST. VINCENT rendered such treatments after the implied requests for such services by BCBSLA and ST. VINCENT intended those services to benefit, among others, BCBSLA.

62.    BCBSLA directly and deliberately benefited from those services by prompting, through its words and prior and ongoing conduct, and through the custom and practice in the healthcare industry, that ST. VINCENT perform those services on Patients who were beneficiaries of BCBSLA, thus fulfilling BCBSLA's obligation to secure medically necessary healthcare for its beneficiaries. When Patients received those services, the express insurance coverage agreement made between BCBSLA and Patients was satisfied and BCBSLA was able to retain rightfully the premiums paid on behalf of Patients for enabling Patients to receive the medical care performed by ST. VINCENT. Further, ST. VINCENT directly conferred a benefit upon BCBSLA when it helped BCBSLA make good on promises BCBSLA made to its own members/beneficiaries that it would arrange for them to receive timely medical care, when necessary, at a first-rate medical facility.

63.    ST. VINCENT provided medically necessary care to the BCBSLA beneficiaries as described above.

64.    ST. VINCENT properly billed BCBSLA for the medically necessary services provided to Patients as listed in Ex. A.

65.    ST. VINCENT is informed and believes and alleges thereon that BCBSLA expressly instructed its beneficiaries (including Patients) to seek medical care in an emergency

from the nearest medical provider and for such beneficiaries to tell the emergency medical provider to send BCBSLA the bills for such care for payment by BCBSLA (except for co-payments, deductibles and co-insurance amounts, if any).

66.     After ST. VINCENT rendered the care specified in Ex. A to Patients, ST. VINCENT properly and timely billed BCBSLA for such care.

67.     The reasonable value of the medical care provided was and is the usual and customary charges of those services that is the total billed charges in the bills submitted to BCBSLA by ST. VINCENT for $1,309,738.57. BCBSLA paid only $444,778.18, leaving a deficit of $864,960.39 owed to ST. VINCENT.

68.     Despite demands thereon, BCBSLA has refused to pay fully ST. VINCENT for the medical care rendered to Patients as set forth in Exhibit A.

69.     ST. VINCENT did not perform these services gratuitously, but rather expected to be paid the reasonable and customary value for such services which amounts to $1,309,738.57.

70.     BCBSLA unjustly benefitted by not paying fully ST. VINCENT for the reasonable value of such services. BCBSLA promised its beneficiaries (including Patients) that it would pay medical providers who provided emergency and necessary medical treatment to those beneficiaries in exchange for Patients' premiums, collected such premiums and then refused despite demands to fully and properly pay ST. VINCENT the reasonable and customary value of the medical care rendered to BCBSLA's beneficiaries as specified in Ex. A. BCBSLA accepted the services ST. VINCENT provided to Patients as demonstrated by acts including but not exclusive to issuing authorizations and collection of premiums.

71.    As a direct and proximate result of BCBSLA's misconduct, ST. VINCENT has suffered damages in an amount to be proven at trial but not less than the sum of $864,960.39, exclusive of interest.

72.    WHEREFORE, ST. VINCENT prays this Court enter judgment in its favor and against BCBSLA as follows:

a)   For the principal sum of $864,960.39;

b)  For interest on such principal sum pursuant to Ark. Code Ann. § 4-57-101(d) (eff. Aug. 2013); *Mo. & N. Ark. R.R. v. Entergy Ark., Inc.,* 2013 U.S. Dist. LEXIS 139204 (E.D. Ark. Sept. 27, 2013*)* and;

c)  For such other and further relief as the Court deems just and proper.

Dated:  June 11, 2025

<div style="margin-left:40%">

Respectfully submitted,

LAW OFFICES OF STEPHENSON,
ACQUISTO & COLMAN, INC.


By:    */s/ Lauren K. Miller*
One of the Attorneys for Plaintiff

</div>

Marcus R. Morrow, Esq., AR. Bar No. 2024007
Lauren K. Miller, Esq., AR. Bar No. 2025032
LAW OFFICES OF STEPHENSON, ACQUISTO & COLMAN, INC.
20 N. Clark St., Suite 3300
Chicago, IL 60602
Phone: (312)-626-1870
Fax: (818)-559-5484
mmorrow@sacfirm.com (cc: lbencomo@sacfirm.com)
lmiller@sacfirm.com (cc: sboyd@sacfirm.com)

# EXHIBIT A

| | | | | | ST. VINCENT Y V. BLUE CROSS BLUE SHIELD OF LOUISIANA | | |
|---|---|---|---|---|---|---|---|
| | | | | | FC 34801 | | |
| No. | Admit Date | Discharge Date | Patient ID | Total Charges | Total Paid | Total Outstanding Per Blue Card Program | Total Outstanding Per Quantum Meruit | |
| 1 | 4/7/2023 | 5/1/2023 | ZVB202968725 | $432,195.35 | $193,466.91 | $26,225.85 | $238,728.44 | RATE OF PAYMENT |
| 2 | 9/28/2020 | 10/30/2020 | XUQ202673451 | $394,803.28 | $119,187.66 | $60,053.56 | $275,615.62 | RATE OF PAYMENT |
| 3 | 6/26/2022 | 7/11/2022 | XUP202689706 | $108,648.68 | $39,431.63 | $5,459.47 | $69,217.05 | RATE OF PAYMENT |
| 4 | 8/16/2021 | 8/25/2021 | XUP201808093 | $145,718.12 | $19,811.92 | $3,751.34 | $125,906.20 | RATE OF PAYMENT |
| 5 | 8/2/2021 | 8/18/2021 | XUP202792969 | $228,373.14 | $72,880.06 | $8,056.08 | $155,493.08 | RATE OF PAYMENT |

ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2025-Jun-11  15:41:31
60CV-25-6083
C06D12 : 1 Page

**Total**    $ 1,309,738.57    $ 444,778.18    $    103,546.30    $    864,960.39